**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
(Alexandria Division)

UNITED STATES OF AMERICA,

v.

SCOTT B. MACKENZIE,

     *Defendant.*

No. 1:18-cr-00309-LO

Sentencing: February 21, 2020

## DEFENDANT SCOTT B. MACKENZIE'S SENTENCING MEMORANDUM

    Scott B. Mackenzie by his attorney, Andrea L. Moseley, hereby submits the following sentencing memorandum in this matter.  Mr. Mackenzie has had a lifetime filled with a deep interest in politics since the 1960 Presidential election and working on behalf of politically concerned citizens, candidates and conservative causes dating back to April 1979.  After decades of a successful career, it is with deep regret that he admits that in the previous decade he became too familiar with the campaign finance laws, FEC regulations and failed to pay the reverence they were due as described in his statement of facts and below.  Mr. Mackenzie is responsible for each of his choices; he has accepted responsibility for his conduct and must now accept the consequences of his failures.

    Pursuant to the sentencing factors set forth in 18 U.S.C. § 3553(a) as delineated in *Rita v. United States*, 127 S. Ct. 2456 (2007), *Kimbrough v. United States*, 128 S. Ct. 558 (2007), *Gall v. United States*, 128 S. Ct. 586 (2007) and *Nelson v. United States*, 555 U.S. 338 (2009), Mr. Mackenzie respectfully requests the Court impose a term of probation, home incarceration or in any event, no more than six months incarceration, followed by three years of Supervised Release.  Mr. Mackenzie submits that the requested sentence is "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. § 3553.  In support of this request,

we submit the following:

**I.      Summary of Plea and Statement of Facts**

Mr. Mackenzie entered a pre-indictment plea to one count of making a false statement, in violation of 18 U.S.C. § 1001, a Class D Felony punishable up to five years imprisonment, a fine the greater of $250,000 or twice the gross loss or gain, full restitution, a $100 special assessment, and three years of supervised release.  In entering his plea of guilty, he consented to a loss figure of $172,200 as defined in USSG § 2B1.1(b)(1)(F) and agreed to pay $172,200 for the United States' to distribute pursuant to 18 U.S.C. § 3663(a)(3).

The offense conduct in this matter falls into three broad categories: (1) reporting to the FEC that Person A (referenced in ¶20 of the PSR) performed work instead of reporting that Mr. Mackenzie actually performed work (crime of conviction); (2) making three (misdemeanor) conduit contributions and filing corresponding false FEC reports concealing the same; and, (3) making excessive contributions from one PAC to another to pay off legal fee debt and filing corresponding FEC reports mischaracterizing certain of these legal fee payments.

*1.    Reporting to the FEC that Person A performed work instead of reporting that Mr. Mackenzie performed work between 2011 and 2014 totaling $32,000.*

Between 2001 and 2014, Mr. Mackenzie paid, to his joint account with Person A, $32,000 for "caging," "data entry" and "list maintenance."   He tracked his hours with handwritten notes (that he no longer has as this occurred between 6-8 years ago) and paid himself periodically according to his notes.  He intentionally and falsely reported to the FEC that Person A did the work when she did not.  Mr. Mackenzie sought to hide the fact that he actually performed the $15/hr. clerical work for a totally inane reason, hubris.  Mr. Mackenzie earned much more as a political consultant over the years and he did not want anyone to know that he was doing $15/hr. clerical-type work.   He did not want to hurt his reputation or dilute his marketability.  Kelly Rogers gave

Mr. Mackenzie the budget of $15/hr. for getting caging work done and Mr. Mackenzie decided to earn the extra money and do the work himself.  (Exhibit 1).   Mr. Mackenzie's concern about professional appearances led him to making false statements to officials and continuing the false statements with invoices during the civil lawsuit mentioned in ¶26 of the PSR ("the civil suit"). During the civil suit, he was asked by the civil defendants' attorneys to provide invoices for work indicated on FEC filings.  In response, in 2014, Mr. Mackenzie created invoices that falsely reported Person A as doing the work on the invoices and gave them to his attorneys.

Mr. Mackenzie legitimately earned and paid himself the for the true value of "caging," "data entry" and "list maintenance" services.  (Exhibit 2).  Nearly three years after these events, FBI agents showed up at Mr. Mackenzie's house to ask questions related to various PACs, vendors and individuals associated with those PACs.  He voluntarily spoke to them for more than an hour and later assisted them in gathering records, providing access to records in his home, various PAC records stored outside of his home and provided passwords to computers to make searching them easier.  He was asked about Person A and the work she purportedly did for Conservative Majority Fund ("CMF") and Conservative StrikeForce ("CSF").  The misleading fact is that Person A in fact did a negligible amount of "caging" work, i.e. opening envelopes with Mr. Mackenzie (on as little as one or two occasions).  He rationalized and minimized in his own mind how hiding his identity as the person who performed the services was harmless.  Clearly this was flawed, making these false statements is illegal and he accepts responsibility for having engaged in this conduct. The restitution amounts incorporate the amounts he earned pretending Person A did the work and the agreed loss calculation includes $32,000 for this conduct.

Exhibit 2 details step by step the processing and procedures that Mr. Mackenzie performed in doing the caging, data entry, list maintenance and clerical work he was paid $15/hr. to perform.

Mr. Mackenzie's handwriting is contained on the deposit slip on page 3 of Exhibit 2.  This is one of a multitude of deposit slips used to deposit the money sent in by donors.

   2.   *Three conduit contributions totaling $8,700.*

Mr. Mackenzie participated in three donations made in violation of 52 U.S.C.A. § 30122. In 2012, one contribution for $2700 was made.  In 2015, one contribution for $1000 and one contribution for $2500 to another candidate was made.  Punishment for these payments would be misdemeanor violations under 52 U.S.C.A. § 30109(d)(1)(A)(ii).  As reported in his statement of facts, Mr. Mackenzie filed FEC reports that concealed the true source of each of these contributions.  The restitution amounts and the agreed loss calculation incorporate $8,700 for this conduct.

   3.   *Excessive payments between PACs to pay legal fees*

On May 15, 2015, the campaign referenced in ¶26 of the PSR settled a lawsuit against CSF and the civil defendants for $85,000 plus an agreement that CMF will give over its donor list to the former candidate, Plaintiff.  The settlement agreement included no admissions of wrongdoing on the part of any party.  The civil defendants, including CSF and CMF, incurred substantial attorneys' fees defending against the civil suit.  While PACs can lawfully pay for their own attorneys' fees, these unaffiliated PACs could not pay attorneys' fees for each other in excess of $5000 per year.

   a.   *Tea Party Majority Payments on Behalf of CSF/CMF*

Mr. Rogers directed Mr. Mackenzie to make payments from Tea Party Majority's ('TPM') account on behalf of CSF totaling $67,000.   Mr. Mackenzie's FEC filings related to these payments correctly identified the disbursement as being for legal fees and the amounts that were paid to the law firm, but still violated campaign finance laws because the payments were not for

TPM's own legal fees.  TPM, as an unaffiliated PAC, was not allowed to pay more than $5000 towards CSF/CMF's legal fee debt in one year.

   b.   *CSF and CMF paid legal fees for Company A*

Similarly, Mr. Rogers directed Mr. Mackenzie to pay Company A's legal fees from CSF and CMF funds.  Mr. Mackenzie filed multiple FEC reports detailing these law firm payments correctly.  However, the false information on FEC filings was:  one FEC report regarding October 2015 disbursements, for ($11,800 and $8,200) $20,000 total, was for legal fees but stated that it was for "eMail Fundraising" instead of "reimbursed legal fees;" one FEC filing report regarding a January 2016 disbursement stating that a $500 payment was for  "web development" instead of "legal fees" or "reimbursed legal fees;" and one FEC report regarding a December 2015 disbursement stating that a legal fee payment was a reimbursement of $10,000 to Company A's principal instead of being a "legal fee" payment.

   c.   *The March 2015 invoice*

Last, in March of 2015, Mr. Rogers directed Mr. Mackenzie to create an invoice from CSF to CMF for the sale of CSF's donor list (for $25,208.50).  Very shortly thereafter, he directed Mr. Mackenzie to pay the law firm $25,000 on behalf of CSF.  Mr. Mackenzie received assurances from Mr. Rogers that these legal fee payments from the various PACs were authorized and sanctioned by the PACs attorneys.  Mr. Mackenzie knew the rules against excessive contributions and turned a blind eye to the obvious signs and signals that the timing of this sale and these payments were Mr. Roger's effort to avoid excessive contribution rules and conceal the same.  Mr. Mackenzie is responsible for his part in this conduct as stated in ¶34 of statement of facts and in ¶66 of his PSR.  His restitution responsibility for this payment $25,000.

As a result, Mr. Mackenzie has agreed to pay restitution of $131,000 ($67,000 + $39,000 + $25,000) for his conduct surrounding excessive contributions used to pay off legitimate legal debts of CSF/CMF.

## II.      The Court's Responsibility to Make an Individualized Sentencing Determination

In fashioning a sentence that complies with the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see also Pepper v. United States*, 131 S. Ct. 1229, 1242 (2011) (sentencing in accordance with "sufficient, but not greater than necessary" mandate is court's "overarching duty"), the Court must consider a broad range of factors, including the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), the kinds of sentences available, 18 U.S.C. § 3553(a)(3), the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. § 3553(a)(6), and the need to make restitution to any victims of the offense. 18 U.S.C. § 3553(a)(7); *see also United States v. Booker*, 543 U.S. 220, 259-60 (2005). In addition, the Court must "make an individualized assessment based on the facts presented" and determine their appropriate weight in light of the purposes of sentencing. *Gall v. United States*, 552 U.S. 38, 50-52 (2007). These factors are evaluated below.

## III.     Mr. Mackenzie's Personal History and Characteristics

The Probation Office provided a detailed portrayal of Mr. Mackenzie. He is a 66-year old grandfather of eight with his ninth due in August.  Mr. Mackenzie and his wife have lived in the same house in Arlington, VA for the last 35 years.  Four of his grandchildren live locally and he and his wife take care of them on a weekly basis; two of them stay with him on Tuesdays and Wednesdays (three year-old W.R. and  one year-old, I.R.) and the other two stay with him Friday through Sunday (9 year-old P.Y and 6 year-old L.Y.).  He has six children; Jason, Emily, Reagan,

6

Andrew, Jon and Kelly.  All of them live close by except Jason who lives in California and Andrew, who currently lives overseas.  He maintains a close relationship with each of his children. Mr. Mackenzie grew up in New York and Massachusetts in the 1950s and 60's and then voluntarily enlisted in the United States Army in 1971 with an eye toward serving in the Vietnam War.  He was never deployed overseas but instead received an appointment to the United States Military Academy at West Point.  He attended West Point and after two years chose to complete his college education at the University of Massachusetts.  He graduated with a bachelor's degree in Business Administration and Accounting.

As a member of the military he received the National Defense Service Medal and the Good Conduct Medal.  After being honorably discharged from the United States Army, he became increasingly interested in politics.  In 1979, he became the Deputy-Treasurer for the Reagan Presidential Campaign and later the Deputy-Treasurer for the Reagan-Bush 1984 presidential campaign.  He was employed by the United States Department of Treasury as director of the Olympic coin program around 1982-1983.  In March 1985, Mr. Mackenzie launched his own political consulting company and has earned a modest living running Mackenzie and Company for the last 35 years.

     1.   *Primary financial support for his family and caregiver for his grandchildren.*

Throughout his career, Mr. Mackenzie has financially supported all of his children and his wife.  At this point in his life, when he should be considering retirement and time with his grandchildren, Mr. Mackenzie in a newly convicted felon and is unemployable in the career he has known for the last 40 years.  The new debt of $172, 200 in restitution weighs heavily on his mind and he would like to become employed as soon as possible to begin the repayment of his obligation. Although it will be a challenge because of his advanced age, his felony conviction and the general

stigmas flowing from the media reports on this case, he is hopeful that he will be able to work utilizing his management abilities as well as his computer skills with Microsoft Office.  Mr. Mackenzie is critically concerned that his wife will not be able to remain in their home of 35 years if he can't work due to incarceration.  Mr. Mackenzie was the primary source of income for their household, and his wife is 69 years old and unemployed.  His grandchildren are an enormous part of his life and the potential for being unable to care for them on a weekly basis as he started doing 9 years ago is agonizing.

The character letters submitted on his behalf confirm, from a variety of places in his life, Mr. Mackenzie is seen as trustworthy and kind.  Family and friends confirm that he is a sincere person who cares deeply for and family and his country.  He has volunteered as a coach, Treasurer and Board Member for Arlington Little League baseball (1994-2003) and is a member of their Hall of Fame.  In addition, he has helped numerous candidates experiencing trouble with the FEC without accepting a dime for his work.  He has been a mentor to young professionals and has conducted his professional life with loyalty and humility.  He has taken a personal interest in the well-being of those he worked with and is characterized as a person who is fair and respectful to people regardless of their status, their appearance, their gender or where they came from.  His character letters confirm that he worked tirelessly for the causes he cared about and served many candidates and campaigns with honesty over the years.  (Exhibit 3).

2.   *Health Issues and Advanced Age*

As described in the presentence report, Mr. Mackenzie also faces onerous health challenges. In 2015, he was diagnosed with stage IIB melanoma and unfortunately, this cancer spread to his lymph nodes and brain.  As a result, in March 2017, his diagnosis was upgraded to metastatic melanoma IV and he was told he had 6 months to one year to live.  His most recent tests indicate

he is in remission, but his physicians have indicated that it is critical he receive yearly MRI and CT scans to track the quickly changing nature of his cancer.  In addition, following a surgery to remove a benign tumor in 1955, Mr. Mackenzie has suffered from debilitating headaches that occur almost daily.  No treatments have been successful in resolving his chronic headaches.  Mr. Mackenzie also suffers from chronic bronchitis which occurs once or twice a year and can last for weeks to months.  These facts are confirmed in the medical records provided to probation and by his family character letters.

The years during which Mr. Mackenzie faced his cancer diagnosis were emotionally brutal. These years also overlapped with the civil lawsuit and the accumulation of law firm debt.  While his health is no reason to pardon, the context of Mr. Mackenzie's behavior in this timeframe is important to recognize.  When he was first diagnosed with cancer, he hid this fact from everyone. He did not want to be a burden.  He began to lose focus on his work and developed a feeling of not caring.  His attitude impacted his behavior, his work and the choices he made.  He did not share the news with many people until years later and the truth was, he was suffering silently.

As the Court is no doubt aware, obtaining proper medical care in prison is a challenge because of staffing shortages. The Department of Justice's Office of Inspector General's 2016 report, *Review of the Federal Bureau of Prisons Medical Staffing Challenges*,[1] concluded that there is now an "increased need to send inmates outside the institution for medical care and contribute to increases in medical costs. Additionally, medical staff shortages can impact prison safety and security." Mr. Mackenzie requires ongoing medical monitoring for cancer, and a prison sentence may mean that he does not obtain the treatment that he needs in a timely fashion.  This is

---

[1] https://oig.justice.gov/reports/2016/e1602.pdf

particularly concerning in his case because the episodes of cancer have been so abrupt and overwhelming.

## IV.    The Nature of the Offense

Mr. Mackenzie understands the seriousness of the offense to which he has pleaded guilty and the conduct surrounding his role as a Treasurer under Mr. Rogers.  Under § 3553, however, the Court is tasked with evaluating the nature of the particular offense when determining a sentence. While not asking the Court to ignore the seriousness of what happened, Mr. Mackenzie urges the Court to consider three characteristics of this offense when determining the appropriate sentence for him.

*First*, Mr. Mackenzie's personal profit from his conduct was either minimal or nonexistent. Mr. Mackenzie was employed by the PACs and was being paid for consulting/accounting/bookkeeping-type services that he was in fact providing.  He did benefit from having employment.  However, for these services, Mr. Mackenzie earned approximately $72,000[2] a year over an eight-year period between 2011 and 2018, including the Person A payments made to him for "caging" and clerical services.  For a college-educated professional, the fees he charged for his services was reasonable and necessary for him to fulfill his duties.  The income reported to the Internal Revenue Service cited in ¶ 120 of the PSR is consistent with the United States' analysis of his earnings.  In the United States Sentencing Memorandum in Mr. Roger's case the United States wrote:

> Between the years 2011 and 2018, the defendant's PACs raised $20,872,497 from donors. PSR ¶ 65. Only $269,376—approximately 1.3% of the money raised—was spent on direct contributions to political candidates. PSR ¶ 65. In contrast, the defendant gave as much as $13,724,032 of these donations to his

---

[2] The United States provided an analysis of how much Mr. Mackenzie made from between 2011 and 2018 and the total was a little over $580,000, about $72,000 a year.

> "preferred vendors" to pay their fees, raise more money for the
> defendant's PACs, add new donors to the defendant's donor lists,
> and, in the defendant's own words, simply keep the churn going. *Id.*
> More than $5,000,000 was spent on other vendors and business
> expenses, or pocketed by the defendant and his friends.

*United States v. Kelly Rogers*, 1:19-cr-00270-LO (E.D. Va. 2020), *United States Sentencing Memorandum*, ECF 19, pg. 3.

Using the United States' numbers, Mr. Rogers paid Mr. Mackenzie less than 3% of all monies raised over an eight-year period for the work he performed.  Mr. Mackenzie recorded financial transactions using computer programs, made deposits, paid bills, prepared spreadsheets and databases, did bank reconciliations, data entry, processing, tracking donor names and information in spreadsheets, de-duplicating individual name entries for the FEC, making FEC filings, etc.  He received a reasonable and regular payments for providing these legitimate services and no payments such as kickbacks.

**Second**, the problematic and misleading messaging to donors, cited by the United States in Mr. Roger's sentencing memorandum were not authored, reviewed or approved by Mr. Mackenzie. See *United States v. Kelly Rogers*, 1:19-cr-00270-LO (E.D. Va. 2020), *United States Sentencing Memorandum*, ECF 19, pgs. 3, 9-10.

> In [Mr. Roger's] role as the leader of SCG and his PACs, the
> defendant hired email, telemarketing, and direct mail vendors to
> send solicitations to donors all over the county. PSR ¶ 13. The
> defendant reviewed and approved the text and other content
> (including using the likenesses of candidates) contained in these
> solicitations. *Id.* He also decided what fundraising strategies to
> employ and how to spend the contributions his PACs received from
> donors. *Id.*

*United States v. Kelly Rogers*, 1:19-cr-00270-LO (E.D. Va. 2020), *United States Sentencing Memorandum*, ECF 19, pg. 3.

One email cited by the United States indicates that in March 2013, Mr. Mackenzie offered to brainstorm messaging ideas; then he summarized for Mr. Rogers comments he noticed from

donor correspondence.[3] *United States v. Kelly Rogers*, 1:19-cr-00270-LO (E.D. Va. 2020), *United States Sentencing Memorandum*, ECF 19, pg. 4, ECF 19-1, Ex. A.   Mr. Mackenzie's job and ultimately his role in Mr. Roger's PACs was not to author, review or approve messages that went out to donors.  Mr. Roger's worked with and hired other vendors/professionals to fulfill solicitation duties and messaging.   See *United States v. Kelly Rogers*, 1:19-cr-00270-LO (ED Va. 2020), *United States Sentencing Memorandum*, ECF 19, pgs. 5-12 regarding "Company A" and its employees and "Company B" and its employees.  Mr. Mackenzie was a solo consultant with a college degree in accounting and was essentially a record keeper.   His work for these PACs primarily involved preparing and filing voluminous and detailed FEC filings based on sorting donor mail and recording their contributions for FEC filings and based on the information that Mr. Rogers provided him about expenditures.  While he and Mr. Roger's did discuss what messages might inspire donors, Mr. Mackenzie did not email, tele market, or direct mail vendors to send solicitations to donors all over the county. He did not review and approve the text and other content (including using the likenesses of candidates) contained in these solicitations.  He also did not decide what fundraising strategies to employ and how to spend the contributions his PACs received from donors.

**Third**, Mr. Mackenzie was not in charge of how PAC money was spent.   While Mr. Mackenzie would report to the PAC the state of the finances, he was not the decision maker regarding spending.  Mr. Rogers ultimately decided how PAC money was spent, which vendors to use, how much would be used to reinvest in building his house file, and how much would be a

---

[3] Note that this email is further proof that Mr. Mackenzie was doing "caging" work for Mr. Rogers. He was relaying to Mr. Rogers a summary of the comments from donors that were sent along with their donations.  He was able to relay this information because he was performing the task of opening thousands of pieces of mail and performing the procedures detailed in Exhibit 2.

direct contribution, etc.  Mr. Mackenzie was physically separate from Mr. Rogers on a daily basis.

Mr. Mackenzie's independent consulting office was in his home located miles away from Mr.

Rogers.  Mr. Mackenzie had been running his own business separate and apart from any dealings

with Mr. Rogers for many decades.  As the United States made clear in its' Sentencing

Memorandum, Mr. Rogers was the organizer and leader of these PACs.  *United States v. Kelly*

*Rogers*, 1:19-cr-00270-LO (ED Va. 2020), *United States Sentencing Memorandum*, ECF 19, pg.

18.

## V.    The Kinds of Sentences Available

The Court has at its disposal every sentencing option in framing a just sentence for Mr.

Mackenzie, including a period of supervised release, a period of home detention, or probation with

some form of restriction on Mr. Mackenzie's movement and liberty or a short term of

incarceration. The Supreme Court has specifically recognized that probation is a substantial

punishment:

> We recognize that custodial sentences are qualitatively more severe than
> probationary sentences of equivalent terms. Offenders on probation are nonetheless
> subject to several standard conditions that substantially restrict their liberty. *See*
> *United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of
> probation is that probationers 'do not enjoy the absolute liberty to which every
> citizen is entitled.'" (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987))
> Probationers may not leave the judicial district, move, or change jobs without
> notifying, and in some cases receiving permission from, their probation officer or
> the court. They must report regularly to their probation officer, permit unannounced
> visits to their homes, refrain from associating with any person convicted of a felony,
> and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also
> subject to individual "special conditions" imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48-49 (2007).

Given Mr. Mackenzie's lack of criminal history, non-violent offenses, his withdrawal from

political endeavors, health issues, advanced age and his role as a substantially involved caretaker

for his grandchildren, a probationary sentence, a sentence of home detention, and/or no more than

6 months incarceration, would constitute meaningful, but measured and properly-tailored punishment.

## VI.    The Sentencing Factors in 18 U.S.C. §3553 Do Not Require a Sentence of Incarceration

*Deterrence and Protecting the Public*

Section 3553(a)(2)(B) and (C) require the court to impose a punishment that will "afford adequate deterrence to criminal conduct" and will "protect the public from further crimes of the defendant." Both of those rationales may be satisfied through a non-custodial sentence.

With respect to specific deterrence, a term of imprisonment is unnecessary. Mr. Mackenzie's career as a political consultant is over. Not only because he is now a convicted felon but also because he was required to announce to every donor and the FEC that he was convicted. The media and watchdog groups have reported on his plea of guilty, have conflated him with Kelly Rogers and Mr. Mackenzie's public reputation is tarnished beyond repair. His ability to associate his name with any political cause/fundraising is over. Furthermore, he can be restricted from engaging in fundraising/holding Treasurer positions as a condition of his probation. In addition, there is no need to protect the public from Mr. Mackenzie in the future. He is non-violent, free of alcohol and drugs and has followed all the rules of his pre-sentencing release.

Given his age (66), Mr. Mackenzie is extremely unlikely to recidivate. A Department of Justice report shows that prisoners aged 55 or older recidivate at a rate of 2%. Timothy A. Hughes et al., *Trends in State Parole*, 1999–2000, Bureau of Justice Statistics Special Report (Oct. 2001).[4] A June 2012 report by the ACLU, *At America's Expense: Mass Incarceration of the Elderly*,[5] likewise noted:

---

[4] https://www.bjs.gov/content/pub/pdf/tsp00.pdf
[5] https://www.aclu.org/files/assets/elderlyprisonreport_20120613_1.pdf

There is also overwhelming evidence that prisoners age 50 and older are far less likely to return to prison for new crimes than their younger cohorts. For example, only 7% of New York state prisoners released at ages 50-64 returned to prison for new convictions; this number was 4% for prisoners released at age 65 and older. In Virginia, only 1.3% of prisoners age 55 and older returned to prison for a new conviction.

Of course, the Court will consider the need for general deterrence. We recognize that message was focused upon heavily by this Court during Mr. Roger's sentencing.  For Mr. Mackenzie's conduct, that need can be served through a lengthy period of probation or home detention, combined with the collateral effects of conviction, such as restitution, forfeiture and the like.  No one who sees what has happened to Mr. Mackenzie as a result of his crimes would think that he has gone unpunished merely because he was not confined to prison.  Mr. Mackenzie was required to contact officials he has known for years from the FEC and send notice of his conviction. In addition, Mr. Mackenzie was required to notify donors of his conviction.  He sent out emails to 15,286 people announcing his felony conviction and his withdrawal from politics.  This is an extraordinary level of disclosure to the public and directly to the commissioners of the FEC.  The presumption that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect is flawed.  Research has shown the opposite.  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity"). *See also* Gabbay, supra, at 448-49 ("[T]here is no decisive evidence to support the conclusion that

harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." There can be no doubt that no one would want to stand in Mr. Mackenzie's shoes given the overall impact on his career, his family, his pride and the humiliation of becoming a felon after 66 years.

*Seriousness of the Crime, Promote Respect for the Law and Provide Just Punishment*

Section 3553(a)(2)(A) also requires the Court to select a sentence that reflects the seriousness of the crime, that promotes respect for the law and that provides just punishment. Transparency in federal elections campaigns and disclosures are a serious matter and should not be unfairly minimized, however, this is not a case that involves the most serious allegations of public corruption and/or dissemination of misinformation to the FEC. Notably, some pretty egregious FEC violations in other contexts have in the past been punished by civil[6] remedies. The

---

[6] Federal Home Loan Mortgage Corporation ("Freddie Mac") (MUR No. 5390): The FEC entered into a settlement with Freddie Mac in 2006. The company and a number of named individual executives: (1) contributed $150,000 of corporate funds to the Republican Governors Association; (2) used corporate resources to solicit and collect contributions for specific federal candidates totaling approximately $225,000; and (3) used corporate resources to host fundraising events which raised approximately $1.7 million for various federal candidates. Freddie Mac agreed to pay a $3.8 million fine and cease and desist from further violations, entering into a conciliation agreement with the FEC. The matter was resolved civilly by the company alone. The resolution specifically provides that the FEC in exercise of its prosecutorial discretion would not take any action against the named executives and neither the company nor any executive was prosecuted criminally. See https://www.fec.gov/updates/mur-5390-chartered-corporation-pays-record-38m-civil-penalty/

Centex Construction (MUR No. 5357): In 2003, the FEC negotiated a conciliation agreement with Centex Construction Group, Inc. ("CCG"), Centex-Rooney Construction Co., Inc. ("Rooney"), and 15 individual employees to resolve corporate and conduit campaign violations made over a five-year period. Conduct involved use of CCG's discretionary bonus program to compensate and reward employees for political contributions. Employees were instructed to report their contributions which were recorded in a bonus spreadsheet and added to the bonus amounts employees otherwise would have received under the company's incentive plan. The company reimbursed employees for $56,125 in campaign contributions. The FEC entered a cease and desist order, and CCG, Rooney and several officers and employees agreed to a civil penalty of $168,000. None of these parties were prosecuted criminally. See

sentence should reflect the relative lack of severity of Mr. Mackenzie's particular offense.  We understand that the transparency and integrity of the electoral process motivates the United States to enforce campaign finance laws but clearly, some cases have more impact on the electoral process than others.  We submit that Mr. Mackenzie's conduct falls on the lower end of the impact scale.  A sentence of long-term imprisonment would not be a just punishment, when adequate (but still serious) alternative sentences exist and are appropriate.

*The Need to Avoid Sentencing Disparities*

Counsel submits that a lengthy sentence of probation or in any event a sentence of incarceration of no more than six months would avoid sentencing disparity considering other Federal campaign finance cases on a national level.

---

https://www.fec.gov/files/legal/murs/current/8370.pdf

Apex Healthcare, Inc. and James Chao (MUR No. 5405): In 2005, the FEC settled civilly a variety of 441b and 441f violations with Apex Healthcare, Inc. ("Apex") and the company's President and sole shareholder, James Chao. Apex and Mr. Chao admitted using corporate funds to reimburse $75,500 in contributions made to federal candidates, $70,000 of which went to the "Hynes for Senate" campaign, using corporate funds to reimburse conduit donors. The matter was resolved through a civil penalty of $275,000 and a cease and desist order. Despite the FEC finding that Mr. Chao knowingly and willfully violated the FECA, no criminal prosecution was initiated. See https://www.fec.gov/files/legal/murs/current/38749.pdf

James Rhodes (MUR No. 5305): In 2005, James Rhodes and three of his companies entered into a conciliation agreement with the FEC, settling charges that Rhodes knowingly and willfully violated campaign laws by using 12 former employees and family members to make $37,000 in conduit contributions to two specific campaign committees. Rhodes reimbursed the contributions by writing corporate checks, accounted for in the corporation's general ledger as "cash for travel" and "petty cash." The FEC entered a cease and desist order, and Rhodes agreed to a conciliation agreement and a $148,000 civil fine. Settlements also were reached with two other corporate officers who assisted Rhodes in soliciting, facilitating and reimbursing the conduit contributions.  Each agreed to a civil penalty of  $5,500. None of the parties were prosecuted criminally.   See   https://www.fec.gov/updates/murs-5305-5398-corporate-and-excessive-contributions-in-the-name-of-another/

The United States argues that conduct like Mr. Mackenzie's directly injures the political

process and contributes to public mistrust in the political fundraising process.  Considering the

harms the United States wishes to protect, we ask the court to consider the sentences from cases

cited below.

Gene Stipe, Crim. No. 03-cr-00128 (D.D.C.): In 2003, former Oklahoma state senator
Gene Stipe pled guilty to one felony count of perjury, one felony count of conspiracy to obstruct
a FEC investigation, and a misdemeanor count of conspiracy to violate the campaign finance
laws. Stipe was charged with devising a scheme to funnel $250,000 in illegal funds to the 1998
federal congressional campaign of Walter Roberts, including almost $87,000 through 39 conduit
donors. He also transferred large sums to the Roberts campaign via fraudulently representing
that various payments were for sales that never transpired. He was sentenced to five-years of
probation, six months of home confinement with electronic monitoring, 1,000 hours of
community service, and fined. As part of his plea agreement with the government, Stipe agreed
to resign his state senate seat and surrender his license to practice law. In a matter that included
51 different respondents, the FEC also reached a civil disposition with Stipe, Roberts and several
of the individuals who had a role in the campaign finance scheme. *See* MUR No. 4818. FEC
conciliation agreements were reached with ten individuals as well as the Roberts campaign and
Stipe's Law Firm. Three individuals who assisted in Stipe's conspiracy also were criminally
prosecuted and all received non-custodial sentences. *See* Charlene Spears, Crim. No. 03-cr-96
(D.D.C.) (six months home detention, three years probation, and 200 hours of community
service); Walter L. Roberts, Crim. No. 03-cr-71 (D.D.C.) (two years of supervised release and
200 hours of community service); James E. Lane, Crim. No. 03-cr-102 (D.D.C.) (three years
probation, two months of home confinement and a $5,000 fine).

Fermin Cuza, Crim. No. 05-cr-344 (C.D. Cal.) and Alan Schwartz, Crim. No. 05-cr-157
(D.D.C.): Over the course of several years, Fernando Cuza, Senior Vice President of Mattel, Inc.
("Mattel") and Alan Schwartz, sole proprietor of AMS Consulting Services, LLC ("AMS")
made $120,000 in corporate and conduit contributions to 31 difference campaign committees.
Cuza and Schwartz used AMS to fraudulently bill Mattel for "consulting services," the funds
for which were instead used to reimburse contributions made by Cuza, Schwartz and their
friends and family. Cuza and Schwartz were criminally charged with causing a false statement
to be made to the FEC, and received sentences of one year probation and a $1,000 fine and two
years probation and a $500 fine, respectfully. Cuza and Schwartz also entered into civil
settlements with the FEC. *See* MUR No. 5187.  https://www.fec.gov/data/legal/matter-under-
review/5187/

John W. Erickson, Crim. No. 07-cr-238 (E.D. Wis.): John Erickson pled guilty to
conspiracy and campaign contribution violations in connection with a conduit scheme to make
more than $250,000 to more than 20 candidates at the federal and state levels. Erickson diverted
corporate funds to secure cash for reimbursements, and then created and controlled a cash fund
for reimbursements. The conspiracy involved providing purported loans to family members and

use of corporate expenses and cash. Erickson's violations spanned over five years.  Erickson was sentenced to eighteen months probation and a $5,000 fine.

Simon Fireman: In 1996, Simon Fireman, his corporation Aqua-Leisure Industries Inc., and Fireman's assistant Carol Nichols were charged with making illegal corporate campaign contributions, structuring cash transactions to obtain funds for the illegal contributions, and impeding the FEC. The Information alleged that over a four year period, Fireman used his company to funnel more than $120,000 to two Presidential election campaigns. They also caused conduit contributions to be made to programs associated with two committees. As part of the elaborate scheme, Fireman caused money to be transferred by wire from Hong Kong to a secret trust in the United States and illegally converted into cash in sums calculated to be small enough to avoid detection. Nichols then used the funds to provide cash to 43 conduit Aqua-Leisure employees and other individuals in order to make contributions. After entering guilty pleas, Nichols was sentenced to 4 months home detention and Fireman was sentenced to one year probation, with the first six months to be spent in home confinement, and a $1 million fine.

Abdul Rehman Jinnah, Crim. No. 06-cr-00383, (C.D. Cal.): In 2009, Abdul Jinnah pleaded guilty to using a network of more than a dozen conduit contributors. Mr. Jinnah made $53,000 in illegal conduit contributions through his employees to two political committees supporting various federal candidates, using intimidation tactics to "convince" reluctant employees to comply. Mr. Jinnah received a sentence of three years probation, twelve months home detention and a fine for his conduct (notably, the defendant suffered from coronary disease, diabetes, depression, hypertension, all health concerns relevant to the sentencing here).

David LeBlanc, Crim. No. 06-mj-91 (D.D.C.) and Donald Boucher Crim. No. 06-cr-62, (D.D.C.): Between 1997 and 2002, David LeBlanc, co-founder, President and CEO of LifeCare Holdings, Inc. ("LifeCare") and its wholly owned subsidiary LifeCare Management Services, LLC ("LMS"), and Donald Boucher, LMS's Vice President of Government Relations, and their spouses, made more than $100,000 in campaign contributions reimbursed through corporate funds. Through a complicated scheme of bonuses, salary increases and expense reimbursements, LifeCare funds were used to reimburse contributions made to 30 different campaigns and committees. Through a conciliation agreement and a cease and desist order, the matter was resolved civilly with the FEC. *See* MUR No. 5398. LeBlanc pled guilty to one misdemeanor count of illegal corporate campaign contributions in violation of section 441b,and received a sentence of one year probation and a $100,000 fine. Boucher pled guilty to one count of making a false statement and received one year probation and paid a $50,000 fine to the FEC.

## VII.    Specific Sentencing Guideline Factors

This Court is fully aware of sentencing goals and concepts of fairness, so we will not present an extended discussion on the positives and negatives of the Guidelines as a whole. However, it is beyond dispute that a mechanical application of Sentencing Guidelines calculations can, result in unfair, even absurd, potential sentences.  See *United States v. Adelson*, 441 F. Supp.

2d 506, 512 (S.D.N.Y.) (noting the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"), aff'd 301 Fed. Appx. 93, **1 (2d. Cir. Dec. 9, 2008). Here, the undisputed portion of the offense level is 13 (16 minus 3 for acceptance). The United States asks for 6 levels of disputed enhancements. If the Court finds these enhancements appropriate, we submit that the total offense level being increased by this amount results in an unduly high range. The Department of Justice has recently acknowledged and highlighted the fact that at times enhancements can totally swallow the rule and disproportionately escalate a defendant's sentencing exposure. *United States v. Roger Stone*, 1:19-cr-00018 (ABJ), ECF 286, *Government's Supplemental and Amended Sentencing Memorandum*, pg. 2. We ask the Court to consider the mechanistic nature of cumulative and excessive parsing of elements of the guidelines when ultimately reaching a sentence that is not greater than necessary to achieve the goals of sentencing this particular defendant.

       1.    *Agreements*.

The parties and the Probation Office agree that the base offense level is 6, pursuant to USSG § 2B1.1 and a 10-level upward adjustment applies pursuant to USSG § 2B1.1(b)(1)(F) because the total loss was more than $150,000 but was less than $250,000 (total loss $172,000). The parties agree that Mr. Mackenzie should receive a three-level reduction for his acceptance of responsibility. Therefore, the agreed portions of the guidelines total level 13. The United States has indicated it will request six points of enhancements. We submit that a role reduction of two or three levels is warranted.

2.      *Mitigating Role*.

The facts in this case warrant a role reduction under USSG §3B1.2(b).  For the reasons stated in Sections I and IV. *supra*., Mr. Mackenzie should receive either a two or three level reduction. A defendant who is accountable under § 1B1.3 for a loss amount under § 2B1.1 (Theft, Property Destruction, and Fraud) that greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme may receive an adjustment under this guideline. Mr. Mackenzie received no unlawful personal financial gain from his unlawful conduct relative to the loss amount.  As indicated in the commentary, he may receive an adjustment under this guideline for that reason alone.  Mr. Mackenzie, unlike Mr. Rogers, received no additional financial benefit from the offenses, such as kickbacks.  Mr. Mackenzie earned the money he received between 2011 and 2018 for actual services he provided as an FEC consultant; for collecting, receiving, processing mail and recording donations; doing bank deposits; performing administrative work and for other similar services he provided to each of the relevant PACs.  He did not have a proprietary interest in the criminal activity and was being paid to provide FEC compliance consulting, and other duties as described in this PSR.  Such a defendant should be considered for an adjustment under this guideline.  USSG §3B1.2, comment. (n.2).

Mr. Mackenzie had limited involvement in Mr. Rogers' larger scheme to enrich himself and his businesses.  Mr. Rogers' loss figures are more than double Mr. Mackenzie's.  Mr. Mackenzie did not exercise decision making over how Mr. Roger's PACs spent money and how that money was allocated to vendors or candidates.

3.      *Abuse of Trust enhancement does not apply*.

While we can understand why the United States and the probation office believe this enhancement might apply (because he was familiar with FEC filing), nonetheless, the application

of USSG §3B1.3 under our facts is ultimately misguided.  The Fourth Circuit has explicitly rejected the notion that a job title alone can mechanistically result in the application of this section. "We have long since 'rejected a mechanistic approach to the abuse of trust enhancement that excludes defendants from consideration based on their job titles.'" *United States v. Brack*, 651 F.3d 388 (4th Cir. 2011) citing *United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir.1999). Merely identifying that Mr. Mackenzie was knowledgeable about FEC filings, giving him the title of "FEC filer," does not cinch the United States' argument for the application of USSG §3B1.3. The Fourth Circuit has determined that the proper analysis for the application of USSG §3B1.3 consists of "an individualized determination of each defendant's culpability." *United States v. Moore*, 29 F.3d 175, 179 (4th Cir.1994).   Indeed, every person who falsely files an FEC report could not automatically be subject to this section, further analysis is required.

The Guidelines provide an enhancement "[i]f the defendant ... used a special skill[ ] in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.  Mr. Mackenzie's filing of FEC reports, stating that Person A did the work when he did the work, does not rise to the level of concealing the commission or concealment of a crime.   The United States argued in its response to our PSR objections that "[a]s a PAC treasurer with over 30 years experience, Mackenzie had special and unique skills and knowledge of the Federal Election Laws and FEC rules, as set forth in the CFR and FECA.  Because of his familiarity with FEC recordkeeping, and his experience in defending himself against numerous complaints filed against him at the FEC for failure to follow the law, Mackenzie used his special skill to avoid detection for diverting PAC funds for his own use by reporting Emily Seiler as the recipient of independent expenditures."  This is insufficient to meet the burden to demonstrate a connection between the use of the special skill and the facilitation of a criminal offense.   Mr. Mackenzie filed false

statements regarding Person A to conceal the fact that he performed the services, and this had the natural tendency to influence the FEC in the performance of its official duties.  His "special skill" was not necessary or helpful in making the false statement.  This case is analogous to *United States v. Ellen*, 961 F.2d 462 (4th Cir. 1992) where the district court refused to apply the enhancement. Here, the Fourth Circuit upheld the district court's refusal to apply the enhancement because it concluded that any special skills possessed by the defendant did not facilitate the commission of the offense. According to the Court, the defendant simply failed to obtain a permit and, in this case, such inaction was not facilitated by any expertise that he possessed.  There must be a true connection between the use of the skill and the success of a concealed crime.  That connection is not present here.  The crime is the false reporting itself, not the concealment of another crime.

    4.    *An enhancement for ten or more victims of mass-marketing under USSG §2B1(b)(2)(A) is inapplicable.*

Mr. Mackenzie is not deserving of a two-level enhancement under USSG §2B1(b)(2)(A). Mr. Mackenzie's unlawful FEC filings and relevant conduct do not trigger a victim count or mass-marketing analysis under this section.  For all the reasons stated in Sections I and IV. *supra*, we submit that Mr. Mackenzie's relevant conduct does not require the application of this section.

    5.    *An enhancement for "sophisticated means" under USSG §2B1(b)(10)(C) is inapplicable.*

The relevant conduct for Mr. Mackenzie does not warrant a two-level upward adjustment for sophisticated means.  While we recognize that the Court found this enhancement as it relates to Kelly Rogers' overall relevant conduct, the same rationale does not apply to Mr. Mackenzie given his comparatively limited role in the offense.  For all the reasons stated in Sections I and IV. *supra*, we submit that Mr. Mackenzie's relevant conduct does not require the application of this section.

We submit that the guidelines calculation should be a total offense level of 16, a role reduction of -2 or -3 and he should receive credit for acceptance of responsibility (-2 or -3) depending on the Court's ruling with regard to role).

## VIII.    Restitution and Fines

Mr. Mackenzie has agreed to pay $172,200 in restitution.  It is worth noting that with respect to restitution and fines, Mr. Mackenzie has limited resources to pay these amounts. The probation office noted that Mr. Mackenzie "does not have the ability to pay a fine or the costs of incarceration or supervision." Mr. Mackenzie wishes to pay his debt to society but, if incarcerated, he will have little ability to meet that obligation.

## IX.    If the Court Imposes a Term of Incarceration, Mr. Mackenzie Requests that the Court Recommend FCI Cumberland.

If the Court imposes a term of incarceration it should also include a specific recommendation as to the place of confinement, in order to ensure that any punishment is no greater than necessary. Although a recommendation of a particular BOP facility is just that, the BOP follows judicial recommendations in a great percentage of cases. BOP is required to consider a judge's recommendation. *See* 18 U.S.C. § 3621(b)(4)(B). Mr. Mackenzie requests that he serve any time in the Federal Correctional Institution in Cumberland, Maryland.

## X.    Conclusion

Mr. Mackenzie asks that the Court sentence him to a period of probation, a term of home confinement, or in any event no more than six months incarceration. This will permit him to continue to care for his wife, children and grandchildren and to begin to pay his restitution.

Dated: February 14, 2020

/s/_____
Andrea L. Moseley
VSB No. 43047
Kropf Moseley PLLC
1100 H St. NW; Suite 1220
Washington, D.C.  20005
Phone 202-549-0425
andrea@kmlawfirm.com

*Counsel for Scott B. Mackenzie*


## CERTIFICATE

I hereby certify that on <u>February 14, 2020</u>, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Kimberly Riley Pedersen
John Taddei
William J. Gullotta
US Attorney's Office
2100 Jamieson Ave.
Alexandria, VA  22314
703-299-3700
Kimberly.riley.pederson@usdoj.gov
John.taddei@usdoj.gov
William.gullotta@usdoj.gov

*Counsel for the United States*


/s/_____
Andrea L. Moseley
VSB No. 43047
Kropf Moseley PLLC
1100 H St. NW; Suite 1220
Washington, D.C.  20005
Phone 202-549-0425
andrea@kmlawfirm.com

*Counsel for Scott B. Mackenzie*